**FELIPE GARCIA, Appellant/Defendant**
**v.**
**EDNA M.T. GARCIA, Appellee/Plaintiff**

S. Ct. Civil No. 2012-0075
Supreme Court of the Virgin Islands
September 20, 2013

759

MARK L. MILLIGAN, ESQ., Mark L. Milligan, P.C., St. Croix, USVI, *Attorney for Appellant*.

RENEE D. DOWLING, ESQ., Law Offices of Renee D. Dowling, St. Croix, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(September 20, 2013)

HODGE, *Chief Justice*. Appellant Felipe Garcia appeals from the Superior Court's July 20, 2012 Amended Divorce Decree and Supplemental Findings of Fact and Conclusions of Law, which awarded his former wife, Edna M.T. Garcia, a twenty percent equitable interest in

a piece of real property it characterized as the parties' marital homestead. For the reasons that follow, we vacate the portion of the July 20, 2012 Amended Decree relating to equitable distribution and remand the case to the Superior Court so that it may issue further factual and legal findings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Edna filed a petition for divorce with the Superior Court on September 22, 2004. In her petition, Edna requested, among other forms of relief, that the Superior Court dissolve her marriage to Felipe and "[t]hat the. three lots in Diamond Ruby, one in Beeston Hill and the one lot in Peters Rest be equally divided between the parties." (J.A. 11.) After various proceedings, the Superior Court ultimately concluded that it lacked jurisdiction to divide most of the properties referenced in Edna's petition because they did not qualify as a marital homestead, but that 146 Estate Peter's Rest — owned by Felipe — could potentially qualify for equitable distribution.

At a March 11, 2011 hearing, Felipe recognized that Edna sought equitable distribution of 146 Estate Peter's Rest, and argued that the property did not constitute the marital homestead because (1) it had a dual nature, as portions of the building were rented to tenants, and (2) although Felipe and Edna resided there at some points during their marriage, there were large spans of time during which the parties did not occupy it together. Shortly after Edna began to dispute these claims, the Superior Court stated that it would resolve the property's status after hearing the evidence introduced at trial. The Superior Court then stated that, to ensure the preparation of the parties at trial, it would summarize the factors it would consider in ruling on the request for equitable distribution in the event it concluded that 146 Estate Peter's Rest qualified as a marital homestead. When it identified fault as a factor, Felipe's counsel stated that "[f]ault is not an issue in this case," while Edna's counsel replied, "[y]es, I don't think so. I don't think that we allege — just one second, your Honor." (J.A. 58-59.)

Although the judge provided her with an opportunity to look through her file, Edna's counsel did not further elaborate on the fault issue. Before the hearing concluded, the Superior Court informed the parties that the matter would be set for trial in late May 2011. On March 28, 2011, Edna filed a motion for substitution of counsel, which the Superior Court approved shortly thereafter. On April 29, 2011, Edna, through her new

counsel, filed a motion to amend her divorce petition to allege that Felipe was at fault for the dissolution of their marriage. Felipe opposed Edna's motion on May 11, 2011.

The Superior Court held a bench trial on May 27, 2011. Shortly after the proceeding commenced, the Superior Court, relying on *Allen v. Allen*, 118 F. Supp. 2d 653 (D.V.I. App. Div. 2000), orally held "that there's no need for a motion to amend the complaint if the reason for that motion is to amend to include fault," since that case "specifically states that fault goes to distribution as it concerns marital property." (J.A. 90.) Based on this reasoning, the Superior Court concluded that the issue of amending the petition was moot, and overruled Felipe's objections to the motion. (J.A. 91-93.)

After resolving the amendment and other pretrial issues, the Superior Court proceeded to hear testimony from several witnesses. Felipe testified that he married Edna in February 1988, but that they lived separately for significant portions of their marriage. For instance, Felipe initially testified that that Edna did not move into 146 Estate Peter's Rest until 1997, even though he had moved there in 1992. (J.A. 94-96.) He further explained that 146 Estate Peter's Rest is presently a two-story building, consisting of two apartments on the first floor and two apartments on the second floor. Felipe testified that when he first moved onto the premises, he lived in one of the first floor units by himself, rented the second downstairs apartment to a tenant, and worked on repairing the second floor, which at the time consisted of a single unit. (J.A. 97-98.)

According to Felipe, the second floor was subdivided into two separate apartments at some point between 2000 and 2001. (J.A. 102.) Although Felipe had testified that Edna had moved into 146 Estate Peter's Rest in 1997, he later testified that Edna never occupied the downstairs apartment with him, but had moved with him into one of the upstairs units in 1999 or 2000, (J.A. 103-05), and remained there until she moved out some time in 2001. (J.A. 106.) During his testimony, Felipe denied having any extramarital affairs, stated that he did not know why she moved out, and testified that Edna never expressed any reservations about continuing the marriage at that time. (J.A. 100-01; 106-07.)

Edna's account of events differed from Felipe's testimony. According to Edna, she lived in the downstairs apartment at 146 Peter's Rest from 1990 until 1995, (J.A. 125), but moved out when she discovered that Felipe had an extramarital affair. (J.A. 126.) Although Edna implied in her

testimony that she eventually returned and lived upstairs with Felipe, (J.A. 127), she did not testify as to specific dates. However, Edna testified that she permanently left 146 Estate Peter's Rest in early 2001, since she suspected Felipe of engaging in extramarital affairs again due to changes in his behavior. (J.A. 135, 151.) Although Edna acknowledged, during cross-examination, that she moved out in 2001 yet did not file for divorce until 2004, she was never asked to explain the existence of this gap. (J.A. 153.) During her testimony, Edna also stated that she desired a twenty percent equitable interest in the property, as a "guesstimate." (J.A. 154-55.)

The Superior Court also heard from numerous other witnesses, the majority of whose testimony the parties have inexplicably omitted from the Joint Appendix.[1] A customer relations manager with the Virgin Islands Water and Power Authority ("WAPA"), testified that separate accounts exist for four apartments at 146 Estate Peter's Rest (Trial Tr. 44), and provided the dates service commenced — and, if applicable, terminated — for each unit, as well as the type of service and the name under which the accounts were established. The pertinent records were admitted into evidence. (Trial Tr. 57-58.) The Superior Court also heard testimony from a moving company representative, who provided records — also introduced into evidence — indicating that Edna moved her personal effects from 146 Estate Peter's Rest on January 5, 2001. (Trial Tr. 75-77.) Perhaps most relevant to the issue of fault, two women admitted to having extramarital affairs with Felipe, albeit in the early 1990s.

After both parties rested their cases, the Superior Court heard closing arguments from counsel. Felipe's counsel began by stating that he has been "struggling" with the issue of "what property is to be considered marital property," and argued that Edna could not claim an interest in 146 Estate Peter's Rest in its entirety. (J.A. 158.) The Superior Court interrupted counsel, and observed that "the marital abode can change," for "[a] couple may start out living in . . . one address, and the couple may then move on to another address," (J.A. 160), and asked counsel — assuming a marital abode is present — "whether it's the entire two-floor structure, or just the unit in which the Garcias live as a married couple."

---

[1] Notwithstanding its omission from the Joint Appendix, this Court has access to the full trial transcript since it was electronically filed by the Clerk of the Superior Court on January 10, 2013.

(J.A. 160-61.) When counsel replied that it would "have to be the second floor improvements," the Superior Court stated that the WAPA representative "testified as to four different units, two downstairs and two upstairs," and asked counsel "which unit upstairs would be the marital homestead or abode?" (J.A. 161.) Felipe's counsel responded that the marital homestead would be "[t]he unit that they occupied," and argued that "there is no evidence before this Court as to which of the two units upstairs they occupied," and therefore "we have an additional problem with absence of proof," both as to which unit was actually occupied and the value of that individual unit. (J.A. 161-62.) After addressing various other issues, counsel concluded by stating that Felipe's final position on the existence of a martial homestead was that "it would have to be, if at all, one unit on the second floor that was occupied by the parties at the time of the separation." (J.A. 174.)

During Edna's closing remarks — which, again, were inexplicably omitted from the Joint Appendix — the Superior Court also questioned counsel as to what constituted the marital homestead. Counsel stated that it was Edna's position "that the property is one," and that "[t]he fact that the property was divided into separate units and that there was income derived from those units during the course of the marriage, does not in and of itself make those units separate from the No. 146 Estate Peter's Rest." (Trial Tr. 271.) Although Edna's counsel conceded "if it was 146 and 146-A, and they lived in 146 and they had tenants in 146-A . . . the plaintiff would only be entitled to an equitable distribution of 146," she argued that Felipe's decision to subdivide the building into four units was insufficient to destroy the unitary nature of the property for purposes of equitable distribution. (Trial Tr. 272-73.) At the conclusion of trial, the Superior Court announced that it would take the matter under advisement.

The Superior Court issued a Decree of Divorce on December 30, 2011, which dissolved the parties' marriage, but stated that "[t]he issue of distribution of the marital homestead located at 146 Estate Peter's Rest, St. Croix, U.S. Virgin Islands is hereby reserved for a later determination by this Court." (J.A. 176.) On the same day, the Superior Court issued Findings of Fact and Conclusions of Law, in which it simply found that "[t]he parties have a marital homestead located at 146 Estate Peter's Rest, St. Croix, U.S. Virgin Islands requiring distribution by the Court," (J.A. 178), and reiterated that it would resolve the equitable distribution issue at a later date. (J.A. 179.)

On July 20, 2012, the Superior Court issued an Amended Decree of Divorce, as well as Supplemental Findings of Fact and Conclusions of Law. In its Amended Decree, the Superior Court stated that it is "granting the Plaintiff Edna M.T. Garcia twenty (20) percent (%) interest in the parties' marital homestead located at 146 Estate Peter's Rest, St. Croix, U.S. Virgin Islands." (J.A. 181.) In its Supplemental Findings of Fact, the Superior Court made several findings as to fault and other equitable factors. However, as to the question of whether a marital homestead exists, it only found that "[f]rom 1990 to 1995, the parties resided together in a downstairs unit at Estate Peter's Rest," and "then resided upstairs together until their separation in January 2001." (J.A. 183-84.) Similarly, in its Supplemental Conclusions of Law, the Superior Court devoted only a single paragraph to the threshold question of whether a marital homestead exists:

> 146 Estate Peter's Rest is the marital homestead of the parties and therefore subject to the jurisdiction of this Court, as (1) the parties actually lived there during their marriage; (2) the property is solely owned by at least one of the parties, the Defendant; and (3) the parties were living there at the time of their separation. *Petrohan v. Petrohan*, 48 V.I. 245, 250, 256 ([V.I.] Super. Ct. 2007).

(J.A. 186.) The remainder of the Superior Court's conclusions relate to its decision to award Edna a twenty percent interest in 146 Estate Peter's Rest. Felipe timely filed his notice of appeal on August 6, 2012.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." 4 V.I.C. § 32(a). Since the Superior Court's July 20, 2012 Amended Decree of Divorce constitutes a final judgment, this Court possesses jurisdiction over this appeal. *See Bradford v. Cramer*, 54 V.I. 669, 671 (V.I. 2011) (final order in divorce case is final appealable judgment).

The standard of review for this Court's examination of the Superior Court's application of law is plenary, while the trial court's findings of fact are reviewed for clear error. *St. Thomas-St. John Bd. of Elections v.*

*Daniel*, 49 V.I. 322, 329 (V.I. 2007). "[T]o the extent [the Superior Court's] decision is not based on legal conclusions or factual findings, this Court reviews the Superior Court's distribution of marital assets in a divorce for abuse of discretion." *Harvey v. Christopher*, 55 V.I. 565, 572 (V.I. 2011). Moreover, this Court exercises plenary review over questions relating to the Superior Court's subject matter jurisdiction. *Judi's of St. Croix Car Rental v. Weston*, 49 V.I. 396, 399 (V.I. 2008).

## B. The Superior Court's Jurisdiction to Distribute 146 Estate Peter's Rest

█ █ In the Virgin Islands, the Family Division of the Superior Court "has subject matter jurisdiction over the marital homestead and the personal property of the couple, but not over any other real property." *Bradford*, 54 V.I. at 676 (citing 16 V.I.C. § 109(a)(4); 33 V.I.C. § 2305(d)); *see also Dyndul v. Dyndul*, 541 F.2d 132, 133-35, 13 V.I. 376 (3d Cir. 1976) (explaining the marital property distribution scheme in the Virgin Islands). As this Court has previously explained,

> Under Virgin Islands law . . . a "homestead" was defined as "the abode including land and buildings, owned by, and actually occupied by, a person, or by members of his family free of rental charges." 33 V.I.C. § 2305(a). Although the Virgin Islands Code does not expressly define a "marital homestead," both the United States Court of Appeals for the Third Circuit and the Appellate Division of the District Court correctly interpreted section 2305(a) in conjunction with section 2305(c) of title 33 to hold that a "marital homestead" is any "homestead" in which a husband and wife both reside during the marriage and that is owned by one or both of the spouses.

*Harvey*, 55 V.I. at 573 (collecting cases).[2] In other words, the Superior Court, in a divorce case, lacks subject matter jurisdiction to issue a judgment affecting rights to real property if the property does not qualify as a marital homestead. *Bradford*, 54 V.I. at 677.

---

[2] As this Court noted in *Harvey*, in 2008 the Legislature amended section 2305(a) of title 33 to alter the definition of "homestead." Act No. 6991, § 2 (V.I. Spec. Sess. 2008). However, as in *Harvey*, the parties' property interests in 146 Estate Peter's Rest developed before this change went into effect.

■ Although Felipe's appellate brief largely challenges the Superior Court's consideration of fault and the sufficiency of the evidence to support its equitable distribution award, Felipe also specifically argues that Edna failed to establish that 146 Estate Peter's Rest, in its entirety, constitutes the marital homestead. (Appellant's Br. 12, 14-15.) Moreover, while not raised by Felipe on appeal, we also consider if 146 Estate Peter's Rest — whether in its entirety, or the single unit occupied by the parties — continues to meet the statutory definition of a marital homestead, in light of the fact that Edna permanently moved out in January 2001 but did not file her divorce petition until September 2004. *See Tindell v. People*, 56 V.I. 138, 145 (V.I. 2012) ("[I]f the alleged error relates to the Superior Court's subject matter jurisdiction, this Court exercises plenary review regardless of whether the issue was brought to the attention of this Court or the Superior Court.") (citing *In re Guardianship of Smith*, 54 V.I. 517, 524 (V.I. 2010)). For the following reasons, we conclude that the Superior Court failed to issue sufficient factual findings or conclusions of law to justify its conclusion that it has jurisdiction over 146 Estate Peter's Rest.

### 1. *Abandonment*

The Superior Court, relying solely on *Petrohan v. Petrohan*, 48 V.I. 245 (V.I. Super. Ct. 2007), concluded that a property constitutes a marital homestead if, in addition to satisfying the other statutory criteria, "the parties were living there at the time of their separation." (J.A. 186.) But *Petrohan* — in addition to being non-binding on this Court — does not stand for this broad, unqualified proposition. In that case, the Superior Court recognized that section 2305(d) of title 33 of the Virgin Islands Code, in addition to vesting a divorce court with jurisdiction to dispose of the marital homestead, contains provisions relating to a property's homestead status in other instances. Pursuant to that provision,

> The homestead protection and exemption provided in this section shall continue to attach to the property after the death of the owner thereof, and shall inure to the favor of the surviving spouse while the latter continues to occupy the said homestead, and after the death of both spouses, to the favor of their children until the youngest surviving of these shall have attained majority. *In case either spouse shall abandon the home, the homestead protection and exemption shall continue*

*in favor of the spouse who occupies the property as a dwelling*; and in the case of a divorce, the court which grants it shall make disposition of the homestead in accordance with the equity of the case.

33 V.I.C. § 2305(d) (emphasis added).

■ The issue resolved in *Petrohan*, as it related to the abandonment provision, was a very limited one. As formulated by the *Petrohan* court itself, the question before it was simply "whether a party can abandon a, marital homestead under the abandonment provision in § 2305(d) *after it is subject to the Court's power* to dispose under § 2305(d)." 48 V.I. at 254 (emphasis added). This is because the husband had argued that his wife's "conduct *since* the divorce constitute[d] abandonment;" namely, her decision to relocate to Florida after the divorce action had been initiated. *Id.* at 252 (emphasis added). The Superior Court, in rejecting this argument, announced the following holding:

> Accordingly, the Court holds that from the time a divorce action commences until it is adjudicated or dismissed, a marital homestead is subject to the Court's disposal discretion and not the abandonment language in § 2305(d), provided that the divorce action was not *preceded* by an act of abandonment which necessarily terminated the homestead interest of the abandoning spouse. Any argument that a party to a divorce action has "abandoned" a marital homestead property *subsequent* to the commencement of a divorce proceeding is without merit.

*Id.* at 254 (emphasis in original).

■ The term "abandon," as used in section 2305(d), is not expressly defined in the Virgin Islands Code. However, "[t]he Virgin Islands Legislature has instructed that . . . '[t]echnical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning.' " *Defoe v. Phillip*, 56 V.I. 109, 121 (V.I. 2012) (quoting 1 V.I.C. § 42). In family law, "abandonment" constitutes "[t]he act of leaving a spouse or child willfully and without an intent to return." BLACK'S LAW DICTIONARY 2 (9th ed. 2009). Similarly, in the property law context, one abandons a property by voluntarily relinquishing any rights to it. *Id.* at 2, 1336.

769

■ Thus, not all separations will result in abandonment. For example, courts have declined to find abandonment when some external factor — such as a court order — precludes contact. *See, e.g., Lang v. Lang*, 551 So.2d 547, 548 (Fla. Dist. Ct. App. 1989) (no abandonment of marital home when court order required wife to vacate the premises); *In re D.T.L.*, 722 S.E.2d 516, 518 (N.C. Ct. App. 2012) (no abandonment when domestic violence restraining order prohibits contact); *In the Interest of Christopher D.*, 191 Wis. 2d 680, 530 N.W.2d 34, 44 (Wis. Ct. App. 1995) (no abandonment when custody of child awarded to other spouse). Likewise, courts have found that one spouse does not abandon the marital home if the other spouse engaged in wrongful conduct that required the spouse to leave for his or her safety. *See, e.g., In re Fink's Estate*, 4 Kan. App. 2d 523, 609 P.2d 211, 216-17 (1980) (excessive drinking); *Del Galdo v. Del Galdo*, 51 A.D.2d 741, 379 N.Y.S.2d 479, 481 (1976) (domestic violence).

■ In this case, we cannot determine, without additional findings of fact, whether or not a marital homestead exists that the Superior Court may equitably distribute as part of the divorce action. The uncontradicted evidence introduced at trial establishes that Edna permanently moved out of 146 Estate Peter's Rest in January 2001, but did not file for divorce until September 2004. Moreover, Edna testified that she left because she "accept[ed] that the marriage wasn't going to last." (J.A. 137.) Edna acknowledged the nearly four year gap between moving out and filing for divorce, but failed to provide any explanation for the delay. And while Edna testified to certain events that, if believed by the Superior Court, could potentially establish justification for leaving Felipe — such as her claims that Felipe ordered her to leave the house (J.A. 135), that she had suffered "too much abuse" attributable to his conduct (J.A. 137), and that she had "feared for her safety" as a result of confronting him about his infidelity (J.A. 136) — the Superior Court never made any factual findings on those issues. Since the existence of a marital homestead is a jurisdictional requirement, and 146 Estate Peter's Rest — in whole or in part — would not qualify as a marital homestead if Edna abandoned it before she filed for divorce, we remand this matter to the Superior Court so that it may resolve the jurisdictional question in the first instance, including making the factual findings necessary to enable meaningful appellate review.

## 2. The Marital Homestead

Even if this Court were to assume, without deciding, that Edna did not abandon the marital homestead when she permanently vacated the premises in January 2001, an additional jurisdictional question remains. As the Superior Court recognized at the May 27, 2011 trial, the uncontradicted testimony revealed that Felipe divided the two-story building into four separate apartment units and that Felipe and Edna, at any given point, only occupied a single unit together, with the other units rented to tenants. Moreover, the trial transcript reflects that the Superior Court — like many other courts faced with similar unusual living arrangements[3] — truly struggled with the question of whether the marital homestead encompassed all of 146 Estate Peter's Rest, or only a single apartment within the larger structure. Yet despite raising this issue *sua sponte*, and being well aware of Felipe's position that, if a marital homestead existed at all, it should be limited solely to the single unit the parties actually occupied, the Superior Court ultimately held, without citing to any relevant legal authority or even acknowledging the issue, that 146 Estate Peter's Rest qualified for equitable distribution in its entirety. In his appellate brief, Felipe contends that this constituted error.

We agree. It is well established that a court can never exercise its discretion to simply ignore a challenge to its subject matter jurisdiction. *See, e.g., United States v. Andrews*, 447 F.3d 806, 809 n.1 (10th Cir. 2006). Even if the Superior Court considered whether all or only part of 146 Estate Peter's Rest constituted the marital homestead, and ultimately decided that it possessed jurisdiction to distribute the entire property, its complete failure to provide any legal or factual explanation for its decision — despite seemingly acknowledging the difficulty of the

---

[3] *See, e.g., In re Mirulla*, 163 B.R. 910, 911-12 (Bankr. D.N.H. 1994) (hotel where owner used five rooms as his primary residence qualified as a homestead only as to those five rooms); *In re Vizentinis*, 175 B.R. 824, 826 (Bankr. E.D.N.Y. 1994) (personal residence with 13 percent of square footage devoted to a chiropractic office is a homestead in its entirety); *In re Robinson*, 75 B.R. 985, 988 (Bankr. W.D. Mo. 1987) (structure consisting of a first floor, operated as a bar, and a second floor, where owner resided, was a homestead in its entirety); *In re Kuver*, 70 B.R. 190, 193 (Bankr. S.D. Fla. 1986) (adopting a "divisibility test" to determine, on a case-by-case basis, if condominiums, apartment buildings, and similar structures should qualify as homesteads in their entirety, or only in part); *In re Evans*, 51 B.R. 47, 50-51 (Bankr. D. Vt. 1985) (when owners live on one portion of real property and rent other portion to tenants, the homestead exemption is only applicable to the portion on which they live).

question at trial — makes it impossible for this Court to review the issue on appeal, and thus itself constitutes error. *See Brown v. People*, 56 V.I. 695, 702 (V.I. 2012) ("[W]hen parties properly raise an issue during the course of Superior Court proceedings, the Superior Court possesses an obligation to explain the reasons for its decision in order to enable effective appellate review by this Court.") (citing *Turnbull v. Turnbull*, S. Ct. Civ. No. 2009-0092, 2011 V.I. Supreme LEXIS 4, *4 (V.I. Mar. 1, 2011) (unpublished) and *Spencer v. Navarro*, S. Ct. Civ. No. 2007-0069, 2008 V.I. Supreme LEXIS 18, *7-8 (V.I. June 27, 2008) (unpublished)). Consequently, on remand the Superior Court should, in addition to determining whether Edna abandoned the property, address the merits of Felipe's argument that it only has subject matter jurisdiction to equitably distribute the portion of 146 Estate Peter's Rest actually occupied by the parties.

## C. The Superior Court's Consideration of Marital Fault

Given our holding that the Superior Court did not sufficiently explain how it concluded that it possessed jurisdiction to equitably distribute 146 Estate Peter's Rest, we need not address the merits of its decision to award Edna a twenty percent interest in that property. Nevertheless, this Court, in the interests of judicial economy, may resolve issues that will likely recur on remand in order to provide guidance to the Superior Court. *See, e.g., Frett v. People*, 58 V.I. 492, 512-513 (V.I. 2013); *Fontaine v. People*; 56 V.I. 571, 593 (V.I. 2012); *Smith v. Turnbull*, 54 V.I. 369, 374 (V.I. 2010). We exercise our discretion to address a single issue that will certainly occur on remand if the Superior Court again concludes that it may equitably distribute all or part of 146 Estate Peter's Rest: the appropriate role of marital fault, if any, in an equitable distribution analysis.

The United States Court of Appeals for the Third Circuit first addressed the role of fault in the equitable distribution analysis in *Charles v. Charles*, 788 F.2d 960 (3d Cir. 1986), a case arising after the 1973 amendments to the Virgin Islands divorce, alimony, and child support statutes — all located in title 16 of the Virgin Islands Code — that repealed provisions either authorizing or mandating consideration of fault. *See* Act No. 3418, § 3 (V.I. Reg. Sess. 1973). Although the appellant argued that the Legislature intended, through these amendments, to also prohibit fault as a consideration when ruling on a request to equitably

distribute a marital homestead, the *Charles* majority noted that the Legislature never amended section 2305(d) of title 33, and that the phrase "equity of the case" provides a divorce court with "a broad grant of jurisdiction" that should not be overridden absent "a showing of clear, contrary legislative intent." 788 F.2d at 966. The *Charles* majority also relied on treatises and decisions of courts in other jurisdictions for the general proposition that a legislative body may choose to prohibit fault as a consideration in divorce, but allow fault to play a role in other matters, such as alimony and property distribution.

A dissenting judge in *Charles*, however, took a different position. According to the dissent, the majority overemphasized the fact that the 1973 amendments only altered the divorce, alimony, and child custody provisions in title 16, since those amendments "evince a general determination to eliminate any consideration of fault, not only in the granting of the divorce itself, . . . but also in the ensuing disposition of property. . . ." 788 F.2d at 968 (Garth, J., dissenting). The dissent further emphasized that, except for the pertinent few words at the conclusion of section 2305(d), title 33 — which deals with taxation and finance — has nothing to do with domestic relations law, and one cannot expect the Legislature to "comb through the entire Virgin Islands Code" to explicitly amend every tangentially related statute, *id.*, particularly when section 2305(d) does not refer to fault, but simply provides for division according to the "equity of the case," and "does not connote that equity includes fault." *Id.* at 969. Additionally, prior to *Charles*, "no decision ha[d] been reported in the Virgin Islands in which fault ha[d] been a consideration in the awarding of homestead rights upon divorce," and "[t]hus, it cannot be said that a prior practice of considering fault in the division of marital real property has been carried forward even after the 1973 amendments . . . ." *Id.* Finally, the dissent observed that a significant split exists in terms of how other jurisdictions define similarly worded statutes, and that the New Jersey Supreme Court had recently interpreted its equitable distribution statute — which simply provided for an "equitable distribution of the property" — to exclude consideration of marital fault. *Id.* (citing *Painter v. Painter*, 65 N.J. 196, 320 A.2d 484, 492 (1974)).

██ ██ Since the Superior Court is bound, absent a contrary instruction from this Court, to continue to apply the Third Circuit's interpretation of local law, it faithfully followed precedent when it identified fault as a pertinent factor. *In re People of the V.I.*, 51 V.I. 374,

389 n.9 (V.I. 2009). Decisions of the Third Circuit, however, only represent persuasive authority when this Court considers an issue. *Id.* While Felipe and Edna's appellate briefs erroneously assumed that *Charles* remains binding precedent on this Court, it is well established that parties may not implicitly stipulate to the law, *see Rawlins v. People*, 58 V.I. 261, 269 n.3 (V.I. 2013), "especially in an unsettled and everchanging area" where this Court, were it to "follow blindly an incorrect interpretation of the law," may establish a binding precedent that may unfairly and unjustifiably affect the disposition of other cases. *Murrell v. People*, 54 V.I. 338, 348 (V.I. 2010) (quoting *Carlile v. South Routt Sch. Dist.*, 739 F.2d 1496, 1500 (10th Cir. 1984)). Thus, this Court, in a May 16, 2013 Order, directed Felipe and Edna to file supplemental briefs specifically addressing the issue of whether this Court should continue to follow the holding of *Charles*, and conclude that the Superior Court may consider marital fault when determining how to distribute a marital homestead.

In his supplemental brief, Felipe emphasizes that continued reliance on *Charles* is wholly inconsistent with this Court's recent decision in *Matthew v. Herman*, 56 V.I. 674 (V.I. 2012), in which this Court declined to recognize the amatory torts of criminal conversation and alienation of affection. According to Felipe, our *Matthew* decision precludes Edna from suing either of Felipe's alleged lovers to receive monetary damages for the breakdown of her marriage, and to allow her a *de facto* recovery from Felipe by allowing consideration of fault in an equitable distribution action would be unjust and "legally irreconcilable" with *Matthew*. (Appellant's Supp. Br. 6.) Felipe also notes that the pertinent inquiry has always been the meaning of the phrase "equity of the case" found in section 2305(d), and that the Third Circuit misconstrued the pertinent statutes by pre-supposing that the phrase "equity of the case" always encompassed marital fault; according to Felipe, the proper inquiry is not whether the 1973 amendments implicitly repealed section 2305(d) — the approach undertaken by the Third Circuit — but whether Virgin Islands statutory law *ever* authorized consideration of fault in this context.

Edna, in contrast, essentially adopts the *Charles* majority's reasoning as her own. Without directly addressing any of Felipe's arguments — despite the fact that Felipe filed his supplemental brief almost two weeks before Edna filed hers — Edna simply states that the Legislature must agree with the *Charles* majority's interpretation of section 2305(d)

because it has not enacted any other substantive changes to the pertinent divorce laws in the 27 years since the Third Circuit issued *Charles*.

As a threshold matter, we reject Edna's claim that the Legislature's inaction between 1986 and the present represents agreement with the *Charles* majority's interpretation of section 2305(d). Edna ignores the fact that section 2305(d) was enacted by the 4th Legislature in 1962 and the 1973 amendments were passed by the 10th Legislature, but that neither was interpreted by a court until 1986, during the tenure of the 16th Legislature. The Virgin Islands Legislature is not a continuing body; it is a political branch of government whose members are elected to two-year terms, with the entire body standing for election in even-numbered years. The fact that the 16th through 30th Legislatures have taken no direct action to respond to the *Charles* decision is wholly irrelevant to the question of whether the *Charles* majority properly interpreted section 2305(d) or the 1973 amendments. *See Massachusetts v E.P.A.*, 549 U.S. 497, 529-30, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant when it amended [the statute] in 1970 and 1977."); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S. Ct. 1994, 20 L. Ed. 2d 1001 (1968) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance."); *United States v. Price*, 361 U.S. 304, 313, 80 S. Ct. 326, 4 L. Ed. 2d 334, 1960-1 C.B. 701 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); *Cobell v. Norton*, 428 F.3d 1070, 1075, 368 U.S. App. D.C. 249 (2005) ("[P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight."); *see also* 2B Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 49:9 & n.2 (7th ed. 2012) ("[L]egislative inaction also has been called 'a weak reed upon which to lean' and a 'poor beacon to follow' to construe a statute.") (collecting cases); *but see Gov't of the V.I. v. Prescott*, 18 V.I. 110, 113 n.3 (V.I. Super. Ct. 1981) (observing that failure of Legislature to amend 14 V.I.C. § 298(5) in response to holding reached in a case construing and applying that statute in 1979 was deemed "an indication of legislative approval" of that holding).

775

■ Before turning to the merits of the question on which we ordered supplemental briefing, we reiterate our longstanding position that decisions of the Third Circuit interpreting local Virgin Islands law issued during the period in which that court served as the *de facto* court of last resort for the Virgin Islands are "entitled to great respect." *Defoe*, 56 V.I. at 120 (quoting *People v. Todmann*, 53 V.I. 431, 438 n.6 (V.I. 2010)). And while this Court unquestionably possesses the authority to depart from those holdings, *id.*, we recognize that there are costs associated with doing so, such as potentially "disrupt[ing] the state of the law in the Virgin Islands." *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 981 (V.I. 2011). The fact that a particular interpretation of the law "has received widespread acceptance in Virgin Islands courts," *id.*, is not in itself dispositive, for "*stare decisis* is a principle of policy and not a mechanical formula of adherence . . . however . . . questionable, when such adherence involves collision with a . . . doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Id.* at 985 n.10 (quoting *Helvering v. Hallock*, 309 U.S. 106, 119, 60 S. Ct. 444, 84 L. Ed. 604, 1940-1 C.B. 223 (1940) (internal quotation marks omitted)).

We find that the rule announced in *Charles* is particularly suited for reexamination by this Court. First, while 27 years have passed since the Third Circuit decided *Charles*, we note that marital fault has been the decisive factor in only a relatively small number of equitable distribution cases. *See, e.g., Allen*, 118 F. Supp. 2d at 657; *Feddersen v. Feddersen*, 68 F. Supp. 2d 585, 590, 41 V.I. 230 (D.V.I. App. Div. 1999); *accord Martin v. Martin*, 58 V.I. 620, 627 n.5 (V.I. 2013) (noting result would have been the same even without consideration of marital fault). We also note that the *Charles* decision was not unanimous, with a significant dissent. *See Sommers v. City of Flint*, 355 Mich. 655, 96 N.W.2d 119, 122 (1959) (noting that prior decision "was decided . . . by too close a margin to carry great weight under the doctrine of *stare decisis*."). Additionally, as we explain below, distribution of the marital homestead represents an anachronism in Virgin Islands law in that, as a result of the *Charles* decision, it is the only part of a divorce action in which the Superior Court is permitted to consider marital fault. Given the unique handling of the marital homestead, examination by this Court is warranted to ensure that this anomalous treatment is justified.

■ Finally turning to the merits, we reject Edna's claim that the *Charles* majority correctly interpreted section 2305(d) and the 1973

776

amendments. The *Charles* majority, whose reasoning Edna has adopted as her own, concluded that "[t]he plain meaning of 'equity of the case' is that courts may consider marital fault," 788 F.2d at 965, and found that the 1973 amendments did not modify this meaning. The *Charles* majority, however, arrived at this conclusion solely by interpreting the word "equity," which it observed was defined as "[j]ustice administered according to fairness as contrasted with the strictly formulated rules of common law." *Id.* at 965 n.13 (quoting BLACK'S LAW DICTIONARY 484 (5th ed. 1979)). However, section 2305(d) provides that "in the case of a divorce, the court which grants it shall make disposition of the homestead in accordance with the equity of the case." 33 V.I.C. § 2305(d). Thus, "case" clearly refers to the divorce case, and — as a result of the 1973 amendments — a divorce is granted without regard to fault. Given the elimination of fault as an element in a divorce action, as well as the fact that fault plays no role in any of the other collateral issues a court must consider after granting a divorce petition, a fair reading of the statute would be that homestead distribution upon "divorce" should also occur without regard to marital fault. And as the *Charles* dissent noted, the phrase "equity of the case" cannot unambiguously encompass marital fault, given that section 2305(d) makes no reference to fault and other jurisdictions interpreting virtually identical language have held that the phrase *excludes* fault. 788 F.2d at 969-70 (Garth, J., dissenting). Moreover, as the dissent also correctly noted, "no decision ha[d] been reported in the Virgin Islands in which fault ha[d] been a consideration in the awarding of homestead rights upon divorce"; in other words, the *Charles* case itself represented literally the only known instance of a Virgin Islands court considering marital fault in determining how to distribute a marital homestead. *Id.* at 969.

Based on these authorities, it could be persuasively argued that even upon the original enactment of section 2305(d) in 1962, the phrase "equity of the case" did not encompass fault, and that the 1973 amendments should have simply eliminated all doubt. Nevertheless, the *Charles* majority justified the implementation or continued consideration of marital fault in equitable distribution cases despite the 1973 amendments on two grounds. Relying on *Robinson v. Robinson*, 187 Conn. 70, 444 A.2d 234 (1982), the *Charles* majority held that fault's inclusion in the balancing of the equities was warranted because "a spouse whose conduct has contributed substantially to the breakdown of

the marriage should not expect to receive a financial kudo for his or her misconduct." 788 F.2d at 967 (quoting *Robinson*, 444 A.2d at 236).

We find the *Charles* majority's reliance on *Robinson* problematic in several respects. First, we disagree that barring consideration of marital fault would result in Felipe receiving a "financial kudo," given that he already owns 146 Estate Peter's Rest. More importantly, the *Charles* majority failed to give sufficient consideration to the fact that Connecticut was among the states that statutorily *mandated* consideration of fault with respect to distribution of all property, and even alimony. Rather, the *Charles* majority attempted to minimize the differences between Connecticut and Virgin Islands statutory law. Although it recognized that the Legislature clearly intended to adopt a no-fault divorce regime in the Virgin Islands, the *Charles* majority reasoned that "the fact that the Virgin Islands Legislature elected to exclude consideration of marital fault from [divorce, child custody, and] alimony determinations does not, standing alone, reflect an intent to exclude such a consideration in property distribution proceedings," and noted that some jurisdictions prohibit consideration of fault in the divorce, alimony, and custody contexts but permit or require it with respect to property distribution. 788 F.2d at 966-67 & n.18.

We find this reasoning unavailing for the *Charles* court overlooked the basic fact that, in a divorce case, the collateral issues before the Superior Court are not limited to alimony, child custody, and equitable distribution of the marital homestead. Pursuant to section 109 of title 16 as amended, the Superior Court also possesses jurisdiction to distribute the spouses' personal property acquired during the marriage and through their joint efforts. And the 1973 amendments to section 109 also included distribution of personal property as one of the areas where the Superior Court may not consider fault. 16 V.I.C. § 109(a)(4) ("Whenever a marriage is declared void or dissolved the court may, without regard to any determination that the breakdown of the marriage was the fault of one party or the other, further decree . . . . for the delivery to [one spouse] of her personal property in the possession or control of [the other spouse].").[4] While the *Charles* majority justified its decision by attempting to explain why the Legislature may wish to prohibit

---

[4] Although the text of section 109(a)(4) of title 16 only provides for the wife to obtain personal property from her husband, the Supreme Court of the United States held, several years

consideration of fault in alimony and custody determinations but maintain fault as a factor in property distribution, the question it actually should have asked is why the Legislature would wish to prohibit fault as a factor in the distribution of personal property, yet allow fault to play a role in distribution of the marital homestead, the single piece of real property the Superior Court may distribute in a divorce case.

Thus, we do not believe that the Legislature rationally could have intended to allow for no-fault alimony and no-fault personal property distribution, yet have fault play a role in distribution of the marital homestead. To the extent the Legislature desired to prevent an adulterous spouse from receiving a "financial kudo," it is not clear why it would use the marital homestead as the vehicle for that purpose. As explained above, a marital homestead only exists if the property is owned exclusively by one or both spouses, and the spouses lived there during their marriage. As a result, numerous divorce cases will not involve a marital homestead. Yet in many divorces, the Superior Court will be required to issue rulings on post-divorce ownership of personal property, some of which — such as cars, boats, electronics, jewelry, shares of stock, bonds and monies deposited with financial institutions — may have substantial value. In fact, had Felipe owned 146 Estate Peter's Rest together with a third party, it would never qualify as a marital homestead, and fault would have played no role in how any of Felipe and Edna's assets would be distributed in their divorce case. Rather, the far more appropriate interpretation is the one proposed by the *Charles* dissent: either the 4th Legislature — like the legislatures of New Jersey and other jurisdictions — did not intend for the phrase "equity of the case" to encompass marital fault, or the 10th Legislature, in enacting the 1973 amendments to eliminate all consideration of marital fault, either neglected to "comb through the entire Virgin Islands Code" to amend tangentially related statutes,[5] or felt an amendment to section 2305(d) was not necessary

---

after the 1973 amendments, that statutes limiting certain post-divorce remedies only to a wife violate the Equal Protection Clause of the United States Constitution. *Orr v. Orr*, 440 U.S. 268, 279-80, 99 S. Ct. 1102, 59 L. Ed. 2d 306 (1979). As a result, Virgin Islands courts have construed section 109(a)(4) to allow the division of both spouses' personal property. *See, e.g., Morris v. Morris*, 20 V.I. 249, 254 (V.I. Super. Ct. 1984).

[5] In fact, we note that the *Charles* dissent's reasoning that the Legislature need not individually amend every single provision in the Virgin Islands Code when it clearly evinces its intent to enact a global change in an area of law has subsequently been endorsed by the Third

given that not a single Virgin Islands court had ever interpreted "equity of the case" to include fault.

Likewise, we believe the *Charles* majority overlooked the historical background that led to the enactment of the 1973 amendments. The Third Circuit decided *Charles* during a time when even no-fault divorce — let alone no-fault alimony, child custody, and property distribution — was a relatively new concept. Although the Virgin Islands allowed for both no-fault and fault-based divorce since its acquisition by the United States from Denmark in 1917, it was not until 1969 when California became the first state to adopt a "pure" no-fault statute. Allen M. Parkman, *Reforming Divorce Reform*, 41 SANTA CLARA L. REV. 379, 383 n.13 (2001). Shortly thereafter, in 1970, the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Marriage and Divorce Act, which — like the California enactment — provided not just for no-fault divorce, but for no-fault alimony, child custody, and property distribution. This Uniform Act was endorsed by the American Bar Association, and "was influential in spreading no fault divorce beyond California," to the point where forty-five states adopted a no-fault divorce procedure by 1974. Carolyn B. Ramsey, *The Exit Myth: Family Law, Gender Roles, and Changing Attitudes Toward Female Victims of Domestic Violence*, 20 MICH. J. GENDER & L. 1, 15 & n.78 (2013). At the time of the *Charles* decision, "every American jurisdiction except South Dakota ha[d] some form of 'no-fault' divorce." 788 F.2d at 965.

While no-fault divorce became available in all fifty states by 1987, the no-fault alimony, child custody, and property distribution provisions of the Uniform Act remained controversial, *see* Herma Hill Kay, *Equality and Difference: A Perspective on No-Fault Divorce and its Aftermath*, 56 U. CIN. L. REV. 1, 2-14 (1987), and the Virgin Islands — implementing such a system through the 1973 amendments — was an early adopter. Although all states but South Dakota had recently adopted no-fault divorce by the time of the *Charles* decision, at the time "[o]nly fifteen states ha[d] 'pure no-fault' divorce laws in [the] strict sense," and even

---

Circuit in other contexts. *See, e.g., Parrott v. Gov't of the V.I.*, 230 F.3d 615, 620-21, 43 V.I. 277 (3d Cir. 2000) (general grant of jurisdiction to Superior Court over all civil actions sufficient to divest District Court of jurisdiction over local habeas corpus petitions, notwithstanding Legislature's failure to amend local habeas corpus statute to remove references to District Court).

fewer eliminated fault as a factor in the financial aspects of divorce. *Id.* at 5-6. In fact, during the mid-1980s, many legal commentators and social scientists severely criticized no-fault laws as insufficiently protecting women and children by reducing alimony awards. *Id.* at 58 & n.289. Nevertheless, by 1996, all but 18 states completely eliminated fault as a consideration in property distribution. Linda Kelly Hill, *No-Fault Death: Wedding Inheritance Rights to Family Values*, 94 KY L.J. 319, 341-42 & nn.102-04 (2005). By 2001, only 15 states continued to vest courts with discretion to consider marital fault in property allocation. *Principles of the Law of Family Dissolution: Analysis and Recommendations*, 8 DUKE J. GENDER L. & POL'Y 1, 42 & n.74 (2001). The fact that the Virgin Islands was not only early to adopt no-fault divorce in this climate of change, but also explicitly extended no-fault to child support, alimony and personal property distributions, should have been given greater consideration by the *Charles* majority in determining whether the Legislature intended, by the 1973 amendments or otherwise, for marital fault to govern distribution of the marital homestead.

Unlike other jurisdictions,[6] the Virgin Islands did not adopt the Uniform Act verbatim; rather, the 1973 amendments simply amended existing provisions of law to remove explicit references to marital fault. However, the Legislature was clearly aware of the model enactment, and the Appellate Division of the District Court, apparently recognizing this fact, specifically instructed the judges of the Superior Court to consider the marital homestead provisions found in section 307 of the Uniform Act when engaging in an equitable distribution analysis. *Allen*, 118 F. Supp. 2d at 658. Given that section 307 explicitly provides for disposition of such property "without regard to marital misconduct," UNIF. MARRIAGE & DIVORCE ACT § 307 (1970), we can discern no legitimate reason for mandating consideration of the non-fault factors set forth in section 307, while completely disregarding what section 307 says about marital fault.

Last, but certainly not least, we agree with Felipe that the same considerations that resulted in this Court declining to endorse the amatory torts caution against permitting the Superior Court to consider marital

---

[6] *See In re Marriage of Hunt*, 909 P.2d 525, 538 & n.12 (Colo. 1995) (identifying Arizona, Colorado, Illinois, Kentucky, Minnesota, Missouri, Montana, and Washington as eight states that adopted the Uniform Act nearly verbatim).

fault as part of its equitable distribution analysis.[7] In *Matthew*, this Court abolished the amatory torts because they (1) had not previously been used by any Virgin Islands court; (2) had been abolished by a majority of other American jurisdictions; and (3) abolition represented the sounder rule because "the torts were originally founded on the idea that wives were property of their husbands," "the torts have destructive results on existing marriages," and "the courts are unable to adequately [value] and address the harms caused by adulterous behavior." 56 V.I. at 682-83. In particular, this Court noted that "the most widely cited reason" in favor of abolition was "the potential for blackmail and extortion between spouses," with another significant reason being "that the court system is ill-equipped to fairly and objectively assess" such claims. *Id.* at 684.

All of these concerns apply with equal force — or perhaps even more[8] — in the fault imputed equitable distribution context. In fact, we need look only to the evidence Edna introduced in the present case to prove that Felipe committed adultery late in their marriage, which is premised entirely on claims that (1) he committed adultery more than twenty years earlier, in the early 1990s, and (2) prior to their separation he would often put on cologne and leave his house at 7 p.m. The evidence relied upon in this case bears a striking resemblance to that used to "prove" alienation of affection and criminal conversation in the *Matthew* case.

---

[7] We recognize that, when this Court abolished the amatory torts in *Matthew*, it had exercised its inherent power to shape the common law, whereas this case involves a question of statutory interpretation. However, this Court has previously turned to the common law, the Restatements, as well as the practices of other jurisdictions, to interpret ambiguous Virgin Islands statutes. *See, e.g., Martinez v. Colombian Emeralds, Inc.*, 51 V.I. 174, 185 n.5 (V.I. 2009) (collecting cases where Supreme Court has applied 1 V.I.C. § 4 to questions of statutory interpretation).

[8] For instance, "[o]ne of the purposes of no-fault divorce was to minimize the pain, humiliation, and acrimony of fault-based divorce proceedings." Sun Hyeong Lee, *Marriage, Divorce, and Dissolution*, 3 GEO. J. INT'L L. 323, 338 (2001); *see also Chapman v. Chapman*, 498 S.W.2d 134, 137 (Ky. 1973) ("To permit evidence on the question of fault would necessarily bring into focus past conduct of the parties, with endless invectives hurled at each other — all to the lasting detriment of the parties and their children."). Thus, allowing the Superior Court to consider adultery and other instances of marital fault in the distribution of the marital homestead wholly negates one of the primary purposes of no-fault divorce, which is to shield the parties from the inherent humiliation in having these issues litigated in public court proceedings, and to ensure that the parties maintain at least some semblance of a cordial relationship with each other and their children after the divorce is granted.

782

■■ ■■ For these reasons, we reject the holding and the reasoning of *Charles*, and conclude that the phrase "equity of the case" in section 2305(d) of title 33 does not encompass marital fault,[9] especially in light of the 1973 amendments. Therefore, in the event the Superior Court determines that it possesses jurisdiction to equitably distribute all or part of 146 Estate Peter's Rest, we direct the Superior Court to equitably distribute the property without any regard to marital fault.

## III. CONCLUSION

For the foregoing reasons, we vacate the portion of the July 20, 2012 Amended Divorce Decree vesting Edna with a twenty percent equitable interest in 146 Estate Peter's Rest, and remand the case to the Superior Court for further proceedings consistent with this Opinion.

---

[9] In reaching our decision herein, we emphasize that, by excluding marital fault from the equitable distribution analysis, we do not intend to preclude the Superior Court from considering factors relevant to the economic position of the parties simply because that factor also contributed to the failure of their marriage. For example, New Jersey — a "no-fault" jurisdiction — authorizes trial courts, when dividing marital assets, to consider if a spouse has "negatively affected the economic status of the parties," such as "if a spouse gambles away all savings and retirement funds, and the assets are inadequate to allow the other spouse to recoup her share." *Mani v. Mani*, 183 N.J. 70, 869 A.2d 904, 916 (2005). As the New Jersey Supreme Court explained, consideration of economic fault factors is necessary "to secure economic justice in matrimonial cases" and to prevent a party from potentially becoming destitute as part of the divorce; consideration of adultery and other marital fault factors, however, does not serve this purpose. *Id.*; *see also Berrios-Rodriguez v. Berrios*, 58 V.I. 477, 486 n.2 (V.I. 2013) (noting that the "nature of the parties' lives together," while impermissibly invoked to introduce evidence of marital fault, could be relevant to a no-fault alimony determination "to the extent necessary to ascertain 'the social and economic position of the family' " as required by statute) (quoting 16 V.I.C. § 341(g)).